UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOGAN LOVELLS US LLP,<br><br>    Appellant,<br><br>    v.<br><br>HOWREY LLP,<br><br>    Appellee. | Case Nos. 14-cv-04882-JD<br>14-cv-04883-JD<br>14-cv-04884-JD<br>14-cv-04885-JD<br>14-cv-04886-JD<br>14-cv-04887-JD<br>14-cv-04888-JD<br>14-cv-04889-JD |
| PILLSBURY WINTHROP SHAW PITTMAN LLP,<br><br>    Appellant,<br><br>    v.<br><br>HOWREY LLP,<br><br>    Appellee. | **ORDER ON APPEAL** |
| SEYFARTH SHAW LLP,<br><br>    Appellant,<br><br>    v.<br><br>HOWREY LLP,<br><br>    Appellee. | |

PERKINS COIE LLP,

  Appellant,

 v.

HOWREY LLP,

  Appellee.

NEAL, GERBER & EISENBERG LLP,

  Appellant,

 v.

HOWREY LLP,

  Appellee.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP,

  Appellant,

 v.

HOWREY LLP,

  Appellee.

SHEPPARD MULLIN RICHTER & HAMPTON LLP,

  Appellant,

 v.

HOWREY LLP,

  Appellee.

JONES DAY,

  Appellant,

 v.

HOWREY LLP,

  Appellee.

Eight law firms that provided legal services to former clients of debtor Howrey LLP appeal the bankruptcy court's denial of their motions to dismiss. The debtor's trustee filed complaints in the bankruptcy court seeking to recover profits from the eight firms after they hired former Howrey partners and were engaged by former Howrey clients. Some of the defendants acquired the partners before Howrey dissolved, others both before and after. Interpreting the law of the District of Columbia, where Howrey operated as a limited liability partnership ("LLP"), the bankruptcy court held that the trustee could pursue profits associated with the partners who left post-dissolution under a fraudulent transfer theory, and profits associated with the pre-dissolution partners through an unjust enrichment claim.

The Court acknowledges the analysis of an esteemed colleague on the bankruptcy court in this district, but comes to different conclusions on these legal issues, which are not specific to bankruptcy law. Whether a bankrupt partnership has a property interest in substantively new representations of its former clients by competing firms has not been directly addressed in District of Columbia case law. The Court finds that the highest court in the District, the District of Columbia Court of Appeals, is likely to join recent state and federal decisions holding that the third-party firms' representations are new matters and not partnership property, and that the partnership cannot recover profits associated with the post-dissolution partners earned by the new firms. Since the new matters are not the bankrupt partnership's property, unjust enrichment theories cannot apply to seize profits associated with the pre-dissolution partners, either. Consequently, the motions to dismiss are granted and the matters are dismissed with prejudice.

**FACTUAL BACKGROUND**

In 2011, Howrey LLP, a large and well-known national law firm, collapsed. As Howrey's troubles began to mount, a number of partners left to join new law firms. *See* Jones Day's Excerpts of Record ("ER") 107 at ¶¶ 114-15, Dkt. No. 14-1.[1] The final curtain fell on March 3, 2011, when Howrey's bank prohibited it from using its cash collateral without the bank's express consent. ER 108 at ¶ 118. Six days later, Howrey's remaining partners voted to dissolve the

---

[1] Docket cites refer to the lead case, 3:14-cv-04889-JD.

1

partnership, effective March 15, 2011. ER 110 at ¶ 129.

At the time of the dissolution vote, Howrey's partners approved a "*Jewel* waiver," named after the California Court of Appeal case of *Jewel v. Boxer*, 203 Cal. Rptr. 13 (Cal. Ct. App. 1984). *Jewel*, which was issued by an intermediate appellate court and not the California Supreme Court, held that a former partner owes a duty to account to the other ex-partners for profits "derived by the partner in the conduct and winding up" of the firm's "unfinished business" -- that is, client matters pending at the time of the firm's dissolution. *See Jewel*, 203 Cal. Rptr. at 19. The *Jewel* waiver purported to waive all rights of Howrey's partners and the partnership itself to the partnership's "unfinished business." ER 110 at ¶ 128.

The law firms appealing the bankruptcy court's order took on one or more former Howrey partners, some of whom left before Howrey's dissolution, and some afterwards.[2] The firms were sued by Howrey's Chapter 11 bankruptcy trustee for the profits associated with hourly fee work they performed on various client matters that the trustee claimed was Howrey's "unfinished business." After two rounds of motions to dismiss, the bankruptcy court allowed the trustee to proceed against the firms. *See In re Howrey LLP* (*Howrey I*), Ch. 11 Case No. 11-31376-DM; Adv. No. 13-3095-DM, 2014 WL 507511, at *11-13 (Bankr. N.D. Cal. Feb. 7, 2014); *In re Howrey* (*Howrey II*), 515 B.R. 624, 628, 630-32 (Bankr. N.D. Cal. 2014).

The bankruptcy court sustained the pre- and post-dissolution claims on different grounds. For the post-dissolution claims, the bankruptcy court held that the trustee could pursue a fraudulent transfer theory because the client matters pending at the time of dissolution were Howrey's partnership property and the *Jewel* waiver improperly transferred this property to the partners without reasonably equivalent value provided in return. *See id.* Since Howrey was insolvent at the time of the transfer, the trustee could "avoid" or nullify the transfer under 11 U.S.C. § 548(a)(1)(B). *Howrey I*, 2014 WL 507511, at *11. The bankruptcy court also found that the Howrey partners transferred "the right to complete the unfinished business without having to

---

[2] Neal, Gerber & Eisenberg LLP; Seyfarth Shaw LLP; Hogan Lovells US LLP; and Kasowitz, Benson, Torres & Friedman LLP only took on "pre-dissolution partners." Perkins Coie LLP; Pillsbury Winthrop Shaw Pittman LLP; Sheppard Mullin Richter & Hampton LLP; and Jones Day took on both "pre-" and "post-dissolution partners."

2

account for any profits" to the law firm defendants, making them immediate transferees of the Howrey partners, and liable to the trustee under 11 U.S.C. § 550(a)(2). *Id.*

For the pre-dissolution claims, the court allowed the trustee to go forward on an unjust enrichment theory. For this claim, the trustee alleges that partners who left pre-dissolution conferred an unfair benefit on the law firm defendants by transferring to them the right to profits associated with client matters Howrey had been handling, and that allowing the firms to keep profits generated by the ex-partners would be unjust. *Howrey II*, 515 B.R. at 630-32.

Defendants each filed timely notices of appeal and motions for leave to appeal. The Court granted leave to appeal in each case, *see* Dkt. No. 9, and has jurisdiction pursuant to 28 U.S.C. § 158(a)(3).[3]

**LEGAL BACKGROUND AND STANDARDS**

The Court reviews the bankruptcy court's legal conclusions de novo. *Kontrabecki v. Oliner*, 318 B.R. 175, 180 (N.D. Cal. 2004). The parties agree that, for purposes of this appeal, District of Columbia law applies, and the decisions of the District of Columbia Court of Appeals, the highest court of the District of Columbia, are therefore binding on this Court. *See C.I.R. v. Bosch's Estate*, 387 U.S. 456, 465 (1967) ("The state's highest court is the best authority on its own law."); *Companhia Brasileira Carbureto de Calicio v. Applied Indus. Materials Corp.*, 640 F.3d 369, 371 (D.C. Cir. 2011) ("The D.C. Court of Appeals is of course the controlling authority for interpretation of D.C. law . . . ."); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1391 (9th Cir. 1994) ("[A] federal court interpreting state law is bound by the decisions of the highest state court."). The Court must apply District of Columbia law as it has been decided and not how the Court believes it ought to be. *Cabrera v. City of Huntington Park*, 159 F.3d 374, 378-79 (9th Cir. 1998). But if the District of Columbia Court of Appeals has not directly resolved or ruled on an issue, this Court is charged with determining how it would likely hold based on all relevant authorities, including decisions from other courts. *See Lewis v. Telephone Employees Credit*

---

[3] The appellants filed eight separate appeals, which the Court consolidated. *See* Dkt. No. 12. Jones Day filed appellants' primary briefing, which the other appellants joined in whole or part. Each appellant filed its own excerpts of the bankruptcy record from its respective case below.

3

*Union*, 87 F.3d 1537, 1545 (9th Cir. 1996) ("In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.").

The trustee argues that two cases from the District of Columbia Court of Appeals, *Beckman v. Farmer*, 579 A.2d 618, 636 (D.C. 1990) and *Young v. Delaney*, 647 A.2d 784, 789 (D.C. 1994), control this case. But these cases involved specific facts far removed from the ones before this Court. *Beckman* involved a three-partner firm, two of whom spent much of their time working on a contingent-fee antitrust case on behalf of the trustee of Laker Airlines, a defunct air carrier, while the third partner attended to the firm's other clients to enable his colleagues to concentrate on the Laker matter. *See Beckman*, 579 A.2d at 624-25, 636 n.24. Eventually, the two partners who worked on the Laker matter -- Beckman and Kirstein -- fell out with the third partner, Farmer, separated their practice from his, and completed the Laker matter on their own, without sharing the contingent fee with him. *See id.* at 624-25. Even before completion of the Laker matter, Farmer sued, demanding an accounting of the Laker fee. *See id.* at 625. The Court of Appeals agreed that Beckman and Kirstein, "in performing post-dissolution work on the Laker antitrust case and collecting the fee, acted as fiduciaries for the benefit of all the partners," and held that they were obligated to account to Farmer for his share of the profits. *See id.* at 636.

*Young* also involved a small partnership that fell apart. Three partners in a four-person firm decided to cut the remaining partner out and continue on their own. *See Young*, 647 A.2d at 787. The new firm comprised of the three partners continued to use the old partnership's funds to pay the partners' monthly draws, as well as various expenses that allegedly benefitted both the dissolved partnership and the new partnership, like rent and the salary of an administrative assistant. *See id.* at 788. The fourth partner sued, alleging that the other partners breached their fiduciary duty to her. *See id.* The trial court granted the defendants' motion for summary judgment, but the District of Columbia Court of Appeals reversed, holding that the trial court had not appropriately dealt with the undisputed fact that "appellees paid expenses associated with the former partnership and the new partnership out of assets belonging to the former partnership." *Id.* at 792.

4

Neither *Beckman* nor *Young* involved an attempt by a bankrupt law partnership to claim the profits earned by preexisting third-party firms subsequently hired by its former clients. It is undisputed that the Court of Appeals has not yet directly confronted this issue. Other courts have, and the emerging consensus is that trustees have no right to those profits under general principles of partnership law.

The New York Court of Appeals addressed this issue under New York partnership law in *In re Thelen LLP*, 24 N.Y.3d 16 (2014), after the Second Circuit asked for its views while reviewing federal district court decisions that had split on the issue. Specifically, the Second Circuit posed two questions: (1) is a client matter billed on an hourly basis the property of a law firm; and (2) if so, how does New York define a "client matter" for purposes of the unfinished business doctrine? *In re Thelen*, 736 F.3d 213, 225 (2d Cir. 2013).

The New York Court of Appeals expressly held that "pending hourly fee matters are not partnership 'property' or 'unfinished business'" under New York partnership law. *Thelen*, 24 N.Y. 3d at 22. The court acknowledged that courts in other jurisdictions had held that "profits arising from work begun by former partners of dissolved law firms are a partnership asset that must be finished for the benefit of the dissolved partnership, absent an agreement to the contrary." *Id*. at 28. But the court found that this approach confused the rules for dividing the property of a dissolved partnership with defining partnership property itself. *See id.* According to the Court of Appeals, New York partnership law, which is drawn from the same Uniform Partnership Act that formed the basis of California partnership law at the time of *Jewel* and District of Columbia partnership law at the time of *Beckman* and *Young*, "supplies default rules for how a partnership upon dissolution *divides* property" but "has nothing to say about whether a law firm's 'client matters' are partnership property." *Id*. Looking specifically at the property definition issue, the court held that a client's legal matter belongs to the client and not the lawyer or her firm. *See id.* at 29. Clients have the unqualified right to hire and fire attorneys at will, with no obligation to the attorney at all except to pay for completed services. *See id*. at 28. Based on that fundamental truth about the attorney-client business relationship, which is recognized throughout the United States, the court concluded that "no law firm has a property interest in future hourly legal fees because

5

they are 'too contingent in nature and speculative to create a present or future property interest.'" *Id*. (citation omitted).

The New York Court of Appeals also discussed the "numerous perverse effects" that would attend to treating a client matter as partnership property. *Id*. at 31. These unhealthy outcomes include: (1) giving an "unjust windfall" of profits to the dissolved firm for work it did not perform; (2) creating a "run-on-the-bank mentality" that incentivizes partners to bolt early with clients and exacerbates a partnership death spiral; (3) and poisoning the marketability of partners who stay to the bitter end and then cannot offer their new firms any profits from ongoing client relationships. *Id*. at 32. Tellingly, the Court of Appeals saw no potential upside whatsoever to the unfinished business doctrine that might ameliorate these harmful effects in any way.

Shortly before the publication of *Thelen*, Judge Breyer in this federal district reached similar conclusions about the unfinished business doctrine under California law. In *Heller Ehrman LLP v. Davis, Wright, Tremaine, LLP*, 527 B.R. 24 (N.D. Cal. 2014), *appeal docketed*, Nos. 14-16314, 14-16315, 14-16317, 14-16318 (9th Cir. Jul. 11, 2014), the court reviewed a decision by the same bankruptcy court on review here that allowed the trustee for the defunct Heller Ehrman LLP law firm to pursue profits made by third-party firms under the unfinished business doctrine. The court addressed whether a dissolved law firm has a property interest in hourly fee matters pending at dissolution and found that a "law firm -- and its attorneys -- do not own the matters on which they perform their legal services. Their clients do." *Id*. at 25.

Because the case involved a California partnership, the court analyzed *Jewel* in detail and concluded that the California Supreme Court was unlikely to treat that intermediate appellate court decision as good law. *Id*. at 26. The court also distinguished *Jewel* on several grounds, including the fact that *Jewel* involved successor firms consisting entirely of partners from the defunct firms who continued to work on existing client matters under the old firms' fee agreements. *Id*. at 29. That contrasted to the situation with Heller, where the new firms were "preexisting third-party" firms with substantial resources and service capabilities unrelated to Heller, and which took on former Heller clients under new engagement letters. *Id*. The court also found that the Revised Uniform Partnership Act, which California adopted after *Jewel* was decided, has no provision

6

1  "that gives the dissolved firm the right to demand an accounting for profits earned by its former

2  partner under a new retainer agreement with a client." *Id*. at 29-30.

3        Like the New York Court of Appeals, the court in *Heller* recognized many fairness and

4  policy reasons to reject the unfinished business doctrine. As a starting point, the court noted that

5  the "dozens of cases" relying on *Jewel* cited it "'reflexively and uncritically,' that is, without much

6  analysis or consideration of the changes in law firm practice or law." *Id*. (quoting *Geron v.*

7  *Robinson & Cole LLP*, 476 B.R. 732, 739 n.2 (S.D.N.Y. 2012), *aff'd*, *In re Thelen LLP*, 762 F.3d

8  157 (2d Cir. 2014)). When the equities are properly considered, the court found that *Jewel* is

9  unfair because it gives the fruits of the third-parties' hard work to a dissolved partnership that did

10  nothing to earn those profits. *See id.* at 30-32. *Jewel* also creates the other types of perverse

11  policy effects that the New York Court of Appeals highlighted in its opinion. *Id*. at 32-33.

12        While neither controlling nor precedential in this case, *Heller* and *Thelen* inform the

13  context in which the Court decides this appeal. As "well-reasoned decisions from other

14  jurisdictions," *Burns v. Int'l Ins. Co.*, 929 F.2d 1422, 1424 (9th Cir. 1991), they are useful in

15  answering the central question in this case -- a question that has not yet been addressed by the

16  District of Columbia Court of Appeals: When a client decides to discharge a firm and hire a

17  competing firm, does the old firm have a right to profit from the new firm's work?

## DISCUSSION

### I. POST-DISSOLUTION CLAIMS

20        The linchpin of the bankruptcy court's orders is that a defunct partnership can assert a

21  property interest in client matters handled by entirely different, preexisting firms under new

22  retention agreements, based solely on the allegation that the new firms hired members of the old

23  partnership. In the bankruptcy court's view, the client may think that it simply exercised its

24  "unfettered right to discharge an attorney" and hire another, *In re Mance*, 980 A.2d 1196, 1203

25  (D.C. 2009), but in reality, it was the departing partner who grabbed a firm asset and took it over

26  to his new firm, as surely as if he "walk[ed] out of his firm's office carrying a Jackson Poll[o]ck

27  painting he ripped off the wall of the reception area." *See Development Specialists, Inc. v. Akin*

28  *Gump Strauss Hauer & Feld LLP*, 480 B.R. 145, 157 (S.D.N.Y. 2012), *rev'd in part*, *In re*

*Coudert Bros. LLP*, 574 F. App'x 15 (2d Cir. 2014). The Court respectfully disagrees, and finds that *Beckman* and *Young* allow a defunct partnership to claim a third-party firm's client profits only in the limited circumstance where the matters are performed pursuant to the same retention agreements by firms that came into existence directly out of the dissolution of the former partnership. Outside of this specific context, third-party client matters are substantively new matters, and the dissolved firm does not own them.

The bedrock of this conclusion is the universally-accepted truth that a firm does not own new client matters taken on by other firms. The bankruptcy court and the District of Columbia have recognized this principle. *See In re Brobeck, Phleger & Harrison LLP*, 408 B.R. 318, 332 n.16 (Bankr. N.D. Cal. 2009) ("the Brobeck partners could not be liable for taking on what would be considered 'new' business, even if that 'new' business involved representing former Brobeck clients"); *see also Howrey I*, 2014 WL 507511, at *1 (duty to account "does not . . . extend to business created after dissolution, even if that business comes from a client of the dissolved firm"); *Beckman,* 579 A.2d at 638 ("The duty to wind up partnership business does not disable the former partners in a law firm from accepting employment from former clients of the dissolved partnership, provided the new employment does not relate to work in progress at the time of dissolution."); D.C. Code § 33-106.03(b)[4] (RUPA § 603(b)) ("Upon a partner's dissociation: . . . the partner's duty of loyalty under § 33-104.04(b)(1) [to account for partnership profits] . . . continue[s] only with regard to matters arising and events occurring before the partner's dissociation, unless the partner participates in winding up the partnership's business pursuant to § 33-108.03.").

But the District of Columbia Court of Appeals has not delineated precisely what a "new matter" is. Consequently, this Court is obliged to make its best prediction, as a matter of first impression under District law, whether the allegations in the trustee's complaint are sufficient to state a claim because the defendants' matters are not new.

The Court believes the Court of Appeals would adopt a rule that is faithful to the new

---

[4] The relevant statutory sections were renumbered in March 2013, but this opinion uses the prior numbering for consistency with the bankruptcy court's opinion and the parties' briefing.

8

matter principle and that is clear and practical in application. Clarity and simplicity are vital here because a vague rule would condemn the courts and litigants to endless speculation about when a client matter is new and when it is a carry-over of a prior engagement. Without a clear rule, defining a new matter would entail almost metaphysical inquiries such as: Are matters the same only when they involve the same client and court case? If so, what is the result for lawyers with counseling practices who are engaged on an open-ended basis by a client to handle issues as the come up? What if a client retained Howrey at the trial court level and switched to Jones Day on appeal after Howrey dissolved? What if the client would have switched even if Howrey had survived, because it preferred Jones Day's appellate practice? What if a client retained Jones Day after Howrey dissolved and then a former Howrey partner joins afterwards to work on the matter? Or what if after Howrey dissolved, a client first switched to a law firm that did not take on any Howrey partners, but then moved on to retain Jones Day, where former Howrey partners work on its matter?

The Court predicts that the District of Columbia Court of Appeals, informed by well-reasoned decisions from other jurisdictions, would want to avoid countless splintered inquiries in favor of the practical rule that client matters performed by pre-existing third-party firms pursuant to new retention agreements are at least presumptively new matters. *See Heller*, 527 B.R. at 29. The lawyers working on these new matters are not engaged in "winding up" unfinished business, because any unfinished business was wound up when the clients terminated their former firm and the firm's lawyers finished "filing motions for continuances, noticing parties and courts that [they were] withdrawing as counsel, packing up and shipping client files back to the clients or to new counsel, and getting new counsel up to speed on pending matters," to the extent those activities were necessary. *Id.* at 32.

*Beckman* itself indicates that continuity of a retention agreement is the touchstone under District of Columbia law for determining when an ex-partner usurped her former partnership's matter. *Beckman* states that the rationale for the "unfinished business rule" is that "dissolution does not terminate or discharge pre-existing contracts between the partnership and its clients, and ex-partners who perform *under such contracts* do so as fiduciaries for the benefit of the dissolved

9

partnership." *Beckman*, 579 A.2d at 636 (emphasis added); *see also Robinson v. Nussbaum*, 11 F. Supp. 2d 1, 6 (D.D.C. 1997) (holding that the "crux of the *Beckman* opinion" was that "dissolution of a law partnership does not terminate existing contracts with its clients" and "former partners who honor these existing contracts do so as fiduciaries for the benefit of the former partnership"). This narrow continuity principle drove the holdings in *Beckman* because the profits being claimed there were earned under the original contract entered into by the dissolved firm. *Beckman*, 579 A.2d at 636 n.24.[5] While *Beckman* noted that former partners can accept "employment from former clients of the dissolved partnership, provided the new employment does not relate to work in progress at the time of dissolution," it did not specify what it meant for the new employment to "relate" to work in progress. *Id.* at 638. Consequently, it is perfectly consonant with *Beckman* to hold, as the Court does, that the District of Columbia Court of Appeals would find that a third-party firm's matter relates to a matter handled by the dissolved partnership only if it is performed under the same engagement contract.[6]

The trustee's complaint falls on the wrong side of this line. Significantly, the trustee's complaints do not allege any continuity of engagement agreements here. They specifically do not allege that the law firm defendants did any work on matters previously connected to Howrey under Howrey's old retention agreements. To the contrary, as appellants' counsel represented at oral argument with respect to lead appellant Jones Day, the law firm defendants signed new

---

[5] Under UPA, which was in effect in the District of Columbia when *Beckman* was decided, a "dissolution" was not limited to situations like Howrey's; rather, "every partner dissociation result[ed] in the dissolution of the partnership, most of which trigger[ed] a right to have the business wound up unless the partnership agreement provide[d] otherwise." *See* RUPA § 603, official cmt. 1 (citing UPA § 38). The two partners who continued to work on the contingent fee matter in *Beckman* likely regarded themselves as the continuation of the old firm and therefore continued working under the same retention agreement after the third partner left, though his departure triggered a technical dissolution. *See Beckman*, 579 A.2d at 634. Unlike UPA, RUPA distinguishes partner dissociation from dissolution.

[6] *Young* does not compel a different result. In that case, the parties agreed that appellees had "paid expenses associated with the former partnership and the new partnership out of assets belonging to the former partnership." *Young*, 647 A.2d at 792. The court therefore did not need to resolve, and did not resolve, what distinguishes "new matters" from partnership assets. In addition, while stating that "[p]rofits derived from the completion of legal cases or uncompleted transactions" were assets of the dissolved partnership, *Young* did not define what a "legal case" or "transaction" is, or even state whether the clients in that case signed new retention agreements after the partnership dissolved.

10

retention agreements with Howrey's former clients. *See* Hearing Transcript at 11:20-12:7, Dkt. No. 39.

In addition to the logic of *Beckman*, the Court finds that the District of Columbia Court of Appeals is likely to reach this holding because it fully captures a client's unqualified right to hire and fire counsel whenever it chooses. The District of Columbia Court of Appeals has recognized "the client's unbridled prerogative to walk away from the lawyer" and to "choose his or her counsel." *See, e.g., Mance*, 980 A.2d at 1203-04 (quoting *In re Cooperman*, 83 N.Y.2d 465, 473 (1994)). The District of Columbia Rules of Professional Conduct also enshrine this principle. *See* D.C. Rule of Prof'l Conduct 1.7(b) cmt. 8 ("Clients have broad discretion to terminate their representation by a lawyer and that discretion may generally be exercised on unreasonable as well as reasonable grounds."). And the New York Court of Appeals relied on this untrammeled right for the outcome in *Thelen*. *See* 24 N.Y. 3d at 28-29 (citing the client's "unqualified right to terminate the attorney-client relationship at any time" in holding that firms do not have rights to future hourly legal fees); *see also Verizon New England, Inc. v. Transcom Enhanced Servs., Inc.*, 21 N.Y.3d 66, 71 (2013) (holding that a party's "ability to terminate the relationship at any time without penalty . . . cannot support a finding that a transferrable property right existed").

The trustee also has no claim to the client matters handled by defendants because they are truly separate firms from, and not remnants of, Howrey itself. In *Beckman* and *Young*, the "new" firms came into existence only upon the dissolution of the old firm, and were composed entirely of former partners of the old firm. *Beckman*, 579 A.2d at 625; *Young*, 647 A.2d 787. In *Beckman*, the client matter in dispute was handled by exactly the same partners pre- and post-dissolution, and under the same retention agreement. *See Beckman*, 579 A.2d at 624-25. Those circumstances are not present here. When, as here, a client discharges a firm and retains preexisting third-party firms -- indeed, competitors of the discharged firm -- it has launched a new matter. *See Heller*, 527 B.R. at 29.

*Beckman* and *Young* contain occasional statements possibly implying that pending client matters may under certain circumstances be partnership property. *See, e.g.*, *Beckman*, 579 A.2d at 642 (holding that "pending contingent fee cases are partnership property and, therefore, assets

11

subject to distribution on dissolution"); *Young*, 647 A.2d at 793 ("Pending cases are uncompleted transactions requiring winding up after dissolution, and are therefore assets of the partnership subject to post-dissolution distribution."). These periodic comments read much more like asides than reasoned holdings.[7] But in any event the Court of Appeals made clear that if such a property right exists, it is subject to qualifications. The court expressly stated that pending matters are partnership assets only when "one partner has exercised his right to compel liquidation and distribution of surplus," but not where the outgoing partner "permits continuation of the business by the other partner(s)," indicating that client matters are not always and everywhere a form of partnership property. *Beckman*, 579 A.2d at 634. And it is more than possible that the D.C. Court of Appeals, if it revisits these issues, will join the New York Court of Appeals in finding that these statements were merely intended to "suppl[y] default rules for how a partnership upon dissolution *divides* property as elsewhere defined," rather than hold that a "law firm's 'client matters' are partnership property" for all purposes. *Thelen*, 24 N.Y.3d at 28. Ultimately, this is a matter for the District of Columbia Court of Appeals to decide, and the Court's holdings here are not based on the assumption that *Beckman* and *Young* are not good law.

The trustee raises two final considerations in favor of finding a claim on the law firm defendants' profits. He suggested at the hearing that reading *Beckman* and other District of Columbia cases as grounded in their specific facts -- small firms with continuity of engagement letters and attorney personnel -- would unfairly afford special status to big firms like the defendants here. Not true. Large national firms are not entitled to any special consideration or treatment merely because of what they are. What drives the outcomes here are dispositive

---

[7] The *Beckman* majority appeared to concede that its discussion of the unfinished business rule was, as Judge Steadman's concurrence put it, "functional dicta," since all that was necessary to dispose of the appeal was the court's holding that the trial court erred in granting summary judgment that Farmer was a partner of Beckman and Kirstein's. *See Beckman*, 579 A.2d at 632 n.19; *see also id.* at 659 (Steadman, J., concurring). It nevertheless proceeded to discuss the issues regarding partnership property for reasons of efficiency. *See id.* at 632 n.19. Similarly, as previously noted, the parties in *Young* did not dispute whether client matters constituted partnership property, and consequently that decision's statements on whether client matters constitute assets may also fairly be considered dicta. *See Young*, 647 A.2d at 792. Even so, the Court recognizes that when it sits in diversity, it is "generally bound by the dicta of state courts," and has treated all of *Beckman* and *Young* as having controlling force. *See Homedics, Inc. v. Valley Forge Ins. Co.*, 315 F.3d 1135, 1141 (9th Cir. 2003).

12

differences in the facts alleged in the trustee's complaints, and the facts relied on in the District of Columbia cases for their holdings.

The trustee also suggests that the new-matter approach would allow unscrupulous lawyers to cut their partners out of lucrative cases by spinning off a new firm and inducing their clients sign new agreements with them. That fear is overblown. As a preliminary matter, there is no indication that this potential problem must necessarily be solved by creating a property right in client matters, or that that is the solution the District of Columbia courts would choose. *See, e.g.*, *Thelen*, 24 N.Y.3d at 30-31 (describing case that addressed the issue through action for breach of fiduciary duty against usurping partners); *LaFond v. Sweeney*, 343 P.3d 939, 946 n.3 (Colo. 2015) (noting that a similar cause of action would be available if ex-partner induced former client to discharge old firm). More immediately, the Court does not need to decide whether a "bad faith" safety valve should be considered because the facts here would not satisfy such an exception, whatever its contours. The post-dissolution Howrey partners did not choose to leave because they wanted to cheat their colleagues. They were forced to leave because their law firm went bankrupt. ER 108 at ¶¶ 118-19. Neither the post-dissolution nor the pre-dissolution partners started their own firms to continue working on the cases they had worked on before; rather, they joined preexisting firms with a number of lawyers, clients, and business resources of their own. The trustee itself has not alleged that the law firm defendants' supposed unfinished business is being performed pursuant to new retention agreements made in bad faith, and so the bad faith issue is not before the Court for decision.

Consequently, in light of these considerations, the Court parts company with the bankruptcy court. The motions to dismiss the post-dissolution claims are granted.

## II. PRE-DISSOLUTION CLAIMS

The bankruptcy court's order allowing the trustee to pursue pre-dissolution claims under unjust enrichment is also reversed. In *Heller*, the trustee conceded that a partner leaving a firm before dissolution had no obligation "to account for unfinished business being taken to another firm" unless the partner had breached a fiduciary duty. *Heller*, 527 B.R. at 28. "[O]nly as a result of Heller's dissolution were departing Shareholders burdened with a duty to account for

13

unfinished business taken from the firm." *Id*. at 31.

In this case, the trustee has taken a different path and has sued to seize profits associated with client matters that former Howrey partners worked on at other firms even before Howrey collapsed. The bankruptcy court found that the District of Columbia allows an unjust enrichment claim "where a plaintiff has an expectation of the benefit that it loses to a third party" and allowed the trustee to proceed on that theory. *Howrey II*, 515 B.R. at 630.

As an initial and dispositive matter, this claim fails for the same reasons the post-dissolution claims fail. The fact that Howrey does not own substantively new representations undertaken by third-party firms is a definitive bar to the pre-dissolution claims because those claims depend on a property right that does not exist.

The unjust enrichment claims also fail for additional, independent reasons. First among these is that the District of Columbia Court of Appeals, in the very decision the trustee cites, has rejected the notion that the unfinished business rule applies when the partnership continues after a partner's departure, as Howrey did when the pre-dissolution partners left. *See Beckman*, 579 A.2d at 634-35; *Robinson*, 11 F. Supp. 2d at 4 n.3 ("The Court of Appeals in *Beckman* made clear that this rule applies only when a partner insists on his right to compel liquidation of the partnership by seeking a winding up of partnership business and a final accounting. . . . This rule does not apply, then, if a partner consents to the continuation of the partnership.").

The trustee, conceding the absence of any support in the governing case law for his position, relies solely on a misreading of D.C. Code § 33-106.03(b) (RUPA § 603(b)). *See* Hearing Tr. 24:19-25:13. That statute states in part:

> Upon a partner's dissociation: . . .
>
> (3) the partner's duty of loyalty under § 33-104.04(b)(1) [to account for partnership profits] . . . continue[s] only with regard to matters arising and events occurring before the partner's dissociation, unless the partner participates in winding up the partnership's business pursuant to § 33-108.03.

D.C. Code § 33-106.03(b) (RUPA § 603(b)). The trustee argues that "matters arising and events occurring" includes all of the firm's pending client matters at the time the partner dissociates. The problem is that this interpretation renders entirely superfluous the clause following the final

14

comma -- a clause that was elided out of the text by the trustee's quote in his briefing. The import of this section is to limit a dissociating partner's duty to account "only . . . to matters arising and events occurring before the partner's dissociation," except upon dissolution of the partnership, when the partner participates in winding up the partnership business -- in which event the duty to account is potentially broader. But if, as the trustee suggests, "matters arising and events occurring" refers to all pending client matters, there is no way that the duty to account could be any broader, and the final clause would serve no purpose. *See* Robert W. Hillman et al., *The Revised Uniform Partnership Act* § 603, authors' cmt. 3e (Westlaw June 2015) ("The better approach [in cases where the firm does not dissolve] is to distinguish pre-dissociation and post-dissociation work and limit the firm's claim to fees that relate to work done prior to dissociation."). The textual difficulty generated by the trustee's interpretation disappears if the term "matters arising and events occurring before the partner's dissociation" refers, as the Court holds, only to work that the partner actually performed at the prior firm before leaving. A pre-dissolution dissociating partner's duty to account is limited to such work, and does not include work performed at her new firm.

In addition, the trustee's unjust enrichment claim fails because District of Columbia law does not recognize a claim for unjust enrichment where the alleged benefit is conferred by a third-party. The District of Columbia Court of Appeals has clearly held that "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Comm'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). Federal courts applying this law have rejected unjust enrichment claims where the benefit was conferred by a third party rather than the plaintiff. *Nevius v. Africa Inland Mission Int'l*, 511 F. Supp. 2d 114 (D.D.C. 2007); *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332 (EGS), 2006 WL 2711527 (D.D.C. Sept. 21, 2006).

The bankruptcy court suggested that the District of Columbia courts and federal courts applying District law had not yet been confronted with a case where the benefit was conferred by a third party with some connection to the plaintiff. *See Howrey II*, 515 B.R. at 631. It noted that the

15

United States District Court
Northern District of California

Restatement (Third) of Restitution and Unjust Enrichment, other provisions of which the D.C. Court of Appeals has adopted, has recognized unjust enrichment claims based on benefits conferred by third parties. *Id.* And it cited to decisions in other jurisdictions that recognize indirect unjust enrichment claims. *Id.* That all may or may not be right. But those considerations are all by the wayside because a claim for unjust enrichment, as currently stated by the District's highest court, requires as an element that "the plaintiff confer[] a benefit on the defendant."

That element is missing here. Howrey is the plaintiff in this case and there is no allegation that Howrey conferred any benefit on the defendant law firms. At most, any benefit they received would necessarily have come from third-parties who are not plaintiffs in this case. That sinks any possibility of an unjust enrichment claim in this case.

Finally, the trustee's conception of the claim abandons any meaningful connection to equity. The purpose of unjust enrichment is to correct a bad situation where a person unfairly gets a benefit that he should not in good conscience be allowed to keep. *See News World Comm'ns*, 878 A.2d at 1222 (unjust enrichment requires as an element that "the defendant's retention of the benefit [be] unjust."). On these facts, and any other reasonably conceivable set of facts the trustee could plead, the trustee cannot possibly have a stronger equitable claim than the law firm defendants to the profits they earned by the sweat of their brow. The law firm defendants performed the work; they deserve the pay. *See Thelen*, 24 N.Y.3d at 31-32 ("By allowing former partners of a dissolved firm to profit from work they do not perform, all at the expense of a former partner and his new firm, the trustees' approach creates an 'unjust windfall' . . ."); *Heller*, 527 B.R. at 30 ("Balancing the equities, it is simple enough to conclude that the firms that did the work should keep the fees."). Giving that money to the dissolved firm is an undeserved boon that equity should not condone.

The trustee's conception of the unjust enrichment claim also leads to bad public policy. Lateraling between firms is the reality of law practice today and has been the reality for many years. As the trustee candidly acknowledged at the hearing, its unjust enrichment theory threatens to impose the heavy hand of court-ordered "equity" on these completely normal career moves:

16

> **THE COURT:** When you lateral, part of your charm to the new firm is you're bringing your, quote/unquote, book. That means your existing works in progress to put it in the terms of these cases. . . .
> So you port it over and you're saying -- tell me yes or no. You are saying that person, that lateral owes money to his prior employer for the lifetime of those cases?
>
> **MR. MURRAY:** Yes. And I will tell you why, but that is definitely our position, and I think it is supported by 603's text, even if policy and the reality of law firms may have evolved since then --

Hearing Tr. at 22:15-23:3. This goes too far, and loses all tether to the purposes of unjust enrichment law.

## CONCLUSION

Because the facts alleged by the trustee do not state claims to the profits earned by the law firm defendants, and there is no prospect that they can be fixed by amendment, the Court dismisses them with prejudice. Since this holding disposes of the appeal in its entirety, the Court does not reach the appellants' other arguments.[8] The clerk is directed to enter judgment in favor of the appellants.

**IT IS SO ORDERED.**

Dated: June 3, 2015

_____
JAMES DONATO
United States District Judge

---

[8] Including, for instance, that *Beckman* and *Young* are inapplicable outside the contingent fee context, that they have been superseded by RUPA, and that the entirety of the law firm defendants' profits constitute "reasonable compensation" under RUPA § 401(h).

17